IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

**Case No.**   4:24-cv-4153

**SECURITIES AND EXCHANGE COMMISSION,**

 Plaintiff,

**v.**

**QZ GLOBAL LIMITED,**
**QZ ASSET MANAGEMENT LIMITED, and**
**BLAKE YEUNG PU LEI,**

 Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against QZ Global Limited ("QZ Global"), QZ Asset Management Limited a/k/a Qianze Asset Management Limited ("QZ Asset"), and Blake Yeung Pu Lei a/k/a Yang Pulei ("Yeung") (collectively, "Defendants") alleges as follows:

<u>SUMMARY OF ALLEGATIONS</u>

1.     QZ Asset, a China-based investment adviser, along with its purported holding company, QZ Global, and the entities' CEO, Yeung, engaged in a concerted scheme involving multiple false statements to defraud hundreds of individuals out of millions of dollars. After raising this money, Defendants stopped communicating with QZ Asset's clients, and QZ Asset's website, which clients accessed to track their funds, was taken down. Clients lost all access to their accounts and funds.

2.      Defendants deceived QZ Asset's clients and prospective clients by falsely claiming that: (1) QZ Asset would provide exceptional returns using artificial intelligence while ensuring that clients' "capital [was] 100% protected"; (2) QZ Global had taken steps to go public, including submitting an application to have its common stock listed on the Nasdaq Global Select Market ("Nasdaq") and having positive interactions with SEC staff; and (3) certain well-known and reputable firms were providing financial and legal services to QZ Asset.

3.      Further, to provide an air of legitimacy to their fraudulent enterprise, Defendants pointed clients and prospective clients to QZ Global's SEC filings, which were available to view on the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, but which were materially deficient and incomplete.

4.      As a result of the conduct described herein, the Defendants violated and, unless restrained and enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Additionally, QZ Asset violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Yeung aided and abetted QZ Asset's violations of Sections 206(1) and 206(2) of the Advisers Act, and unless restrained and enjoined, will continue to do so.

5.      The SEC seeks, against all Defendants: (i) permanent injunctions enjoining Defendants from engaging in the transactions, acts, practices, and courses of business outlined in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the

Exchange Act [15 U.S.C. § 78u(d)(1)], and, as to QZ Asset and Yeung, Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]; (ii) disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint under Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C.§ 78(d)(3), (5), and (7)] together with prejudgment interest; (iii) civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and, as to QZ Asset and Yeung, Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and, with respect to Yeung, (iv) an order barring him from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## DEFENDANTS

6.      **QZ Global**, a South Dakota corporation, was formed on or about January 9, 2023. QZ Global has claimed that its principal office where it conducts its business is in Watertown, South Dakota. QZ Global claims to be a holding company for QZ Asset.

7.      **QZ Asset** is a Chinese company that claims to have a head office in Shanghai, China and offices in Hong Kong, Japan, South Africa, and Malaysia.

8.      **Yeung,** whose identity SEC staff cannot corroborate, is purportedly age 37 or 38. His state or country of residence is unknown. According to QZ Global's Form S-1 filed with the SEC, Yeung is the CEO of QZ Asset and QZ Global.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections

21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)], and

Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], Section 214 of the

Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391(b). QZ Global is a South Dakota

company with a purported principal place of business in Watertown, South Dakota. QZ Asset

advertised its advisory services to the investing public globally through its website and social

media, which were available to view in this district.

## FACTS

### I.  Background.

#### A.  Relationship Between QZ Global, QZ Asset, and Yeung.

11.     QZ Asset holds itself out as an investment manager for institutional and retail

clients and prospective clients that collects revenue from management and performance fees and

trading income.

12.     QZ Global claims to be the holding company for the China-based QZ Asset.

13.     QZ Global made all relevant SEC filings and undertook the purported initial

public offering ("IPO").

14.     Yeung is the CEO of both QZ Asset and QZ Global and is listed as a contact

person in SEC filings for QZ Global. Yeung is also captured in webinars marketing QZ Asset's

advisory services and QZ Global's purported initial public offering ("IPO").

#### B.  QZ Asset's Investment Advisory Services and Advisory Accounts.

15.     From at least October 2022 through May 2023, QZ Asset publicly solicited

clients to open advisory accounts. QZ Asset solicited clients and prospective clients to provide

QZ Asset with funds, which QZ Asset stated it would invest on its clients' behalf. The QZ Asset solicitations were aimed at clients and prospective clients globally, including in the United States, and were made using social media, particularly Facebook, WhatsApp, and video streaming platforms such as Zoom and YouTube.

16.     QZ Asset marketed its advisory accounts as "packages" or "contracts" where purported guaranteed returns on investment ("ROI") were tied to the size of the investment, with larger investments being promised higher ROI. For example, in one "Easter Promotion" shown below, QZ Asset offered a "2% Daily ROI" and "a brand new iPhone" for those funding their accounts with at least $10,000.



17.     QZ Asset clients opened their advisory accounts by signing up via QZ Asset's website and then providing QZ Asset with crypto assets, particularly in the form of Tether.

18.     Once a client deposited money into their QZ Asset account, QZ Asset purported to match the client's deposit dollar-for-dollar, doubling the investment. This purported doubling was reflected in client accounts.

19.     At least some clients entered into QZ Managed Trading Agreements (the "Advisory Agreements") with QZ Asset, in which QZ Asset claimed to open and maintain an advisory account for the client and provide fixed weekly returns.

20.     The Advisory Agreements provided that the client would pay "management fees of up to 50%" of a client's "initial deposit sum" if the client attempted to withdraw money prior to a minimum holding period of 30 days. The required management fees were lowered the longer the client kept their money in their advisory account.

21.     QZ Asset encouraged clients to "be entrepreneurial" by recruiting more clients to open accounts with QZ Asset, promising the recruiting client 10% of the new client's assets under management ("AUM") as an "affiliate bonus." The more clients an existing client recruited, the more bonuses were available to the recruiter client. In addition to the 10% of the new client's investment, QZ Asset promised international trips, luxury cars, and even a United States visa as bonuses.

22.     Among other claims, QZ Asset told prospective clients that it would provide exceptional investment returns by using artificial intelligence—the QZ Big Data and Artificial Intelligence ("BDAI") analytics. QZ Asset claimed BDAI "provides high returns" in all market conditions and effected trades in S&P 500 companies.

23.     QZ Asset claimed its BDAI trading would generate guaranteed ROIs between 2.5% and 7% weekly, "capped at 400%" total. QZ Asset touted the simplicity of its services by stating: "[a]ll you do is just invest, sit back & enjoy your weekly profit."

24.     According to the QZ Asset Company Prospectus 2022/2023 International Edition (the "Prospectus"), Yeung's "vision and ambitions" were "the key drivers for the development of [QZ Asset's] BDAI technology."

25.      QZ Asset hosted biweekly Zoom meetings, on which Yeung often appeared, to market its services to both prospective and current clients. Once a prospective client expressed interest in QZ Asset, for example, by messaging QZ Asset through WhatsApp numbers provided in marketing materials, that prospective client would be added to a WhatsApp chat through which they would receive invites for Zoom meetings and other communications.

**C.  QZ Global's Defective SEC Filings.**

26.      By at least February 2023, Defendants claimed they were preparing to take QZ Global public by undertaking an IPO, including in their Form S-1 filed with the SEC.

27.      On February 24 and 27, 2023, QZ Global filed with the SEC duplicate Forms 1-A—a form used for securities offerings made pursuant to Regulation A [17 C.F.R. § 230.251 *et seq.*], which is an exemption from registration for public offerings—seeking to offer $300 million of common stock. Yeung was listed as a contact person on both Forms 1-A.

28.      Along with both Forms 1-A, QZ Global submitted a Form S-1, the registration statement form used for registering securities offerings. Yeung signed the Form S-1, and it lists him as the contact person.

29.      On March 17, 2023, SEC staff sent a letter addressed to Yeung, as CEO of QZ Global, notifying him that the Forms 1-A were not compliant with Regulation A as they failed to name an underwriter and failed to include the required financial statements. The letter indicated more detailed comments would be provided after Yeung filed a substantive amendment addressing these deficiencies.

30.      Neither Yeung nor anyone from QZ Global responded to the letter or submitted additional or amended filings to the SEC.

31.     On October 24, 2023, SEC staff sent Yeung, as CEO of QZ Global, another letter reiterating that QZ Global's filings failed to comply with Regulation A.

32.     Once again, neither Yeung nor anyone from QZ Global responded to the letter or submitted additional or amended filings to the SEC.

**D.  QZ Asset and Yeung Encouraged Clients to Convert Assets in their Advisory Accounts into Pre-IPO Shares of QZ Global.**

33.     As alleged above, by at least February 2023, Defendants claimed they were preparing for an IPO. A February 6, 2023 QZ Asset press release claimed that QZ Asset had raised $100 million from financial institutions and was seeking to offer and sell another 200 million shares to retail and institutional clients. The press release was available on the QZ Asset website and an image of this press release was included in an undated presentation titled "QZ Initial Public Offering (IPO)-NASDAQ" (the "Nasdaq Presentation").

34.     QZ Asset told clients and prospective clients in presentations and in webinars they could use profits from their QZ Asset accounts to purchase pre-IPO shares in QZ Global. QZ Asset stated that "QZ contracts" could be converted to pre-IPO "QZ Shares," which would ultimately become shares of QZ Global, which would become a public company.

35.     QZ Asset claimed in presentations and in webinars that this conversion opportunity meant that a relatively small amount of funds deposited in a QZ Asset advisory account would become exceptionally profitable due to the QZ Global IPO.

36.     For example, the Nasdaq Presentation, in a slide reproduced below, claimed that a $1,000 investment in a QZ Asset contract would—within months—be worth $20,000 in shares of QZ Global, which it characterized as "20X Capital Gains in under 6 months."



37.     In an undated presentation posted to YouTube on or about February 23, 2023, Yeung discussed this slide, pointing to the 20X capital gains as "the power of [an] IPO."

38.     Similarly, in another undated presentation made available on QZ Asset's website, QZ Asset claimed that a $2,000 investment in a QZ Asset contract would be worth $32,500 in QZ Global shares in approximately six months, as shown below.

**E.  QZ Asset Received Millions of Dollars from its Clients and then Disappeared.**

39.     QZ Asset had at least 285 clients globally, including several in the United States, who collectively sent QZ Asset (and lost) at least $6 million.

40.     In approximately late-May 2023, QZ Asset's website was taken down. Clients could no longer access their QZ Asset accounts and had no way to withdraw their money.

41.     Around this time, QZ Asset stopped communicating with clients and prospective clients via WhatsApp chat groups, where clients received the bulk of communications along with its website, and stopped hosting the weekly Zoom webinars on which Yeung often previously appeared.

## II.  Defendants Made False and Misleading Statements.

### A.  QZ Asset and Yeung Made False and Misleading Claims About Client Assets Being Completely Protected from Loss.

42.     QZ Asset and Yeung made false and misleading statements in presentations and in Advisory Agreements by repeatedly promising that clients would not suffer any losses, and that their capital was 100% protected.

43.     In an undated presentation provided to clients and prospective clients, QZ Asset advertised that "capital is 100% protected," as set forth below, and "What Matters to You, Matters to Us. Dual Benefits, Zero Loss."



44.     A very similar, though shorter, undated presentation was posted to YouTube on or about March 13, 2023. The same claim made above was on a slide within the YouTube presentation, and the audio for that slide stated in part: "QZ Asset Management's slogan is: What Matters to You, Matters to Us. Your peace of mind matters to them. The safety and security of your investment matters to them. That is why they have pioneered an ingenious way to make sure you experience zero loss of your capital with the DAUM [Dual Assets Under Management] method."

45.     Further, the YouTube video's introductory audio to this presentation, and a post accompanying the video stated: "We hope that by the end of this presentation you will see that, number one, the asset management company providing this presentation is not a fly by night operation … [and] that your investment capital is 100% protected …"

46.     Another presentation that was published on YouTube on or about March 19, 2023 made similar assurances, as shown below.



47.     During this presentation, an individual introduced as QZ Asset's marketing director (and identified simply as "QZ Asset" in the video) stated: "The second thing I'd like to share with you … is your capital is 100% protect[ed]."

48.     During this same presentation, Yeung spoke and answered questions, including claiming that the BDAI system was thriving and touting QZ Asset's purported "stop loss system," stating, in part and in response to a question about risk management, "we have this kind-of stop loss system to [] sell when we see the trend which is going down."

49.     Similarly, in a webinar posted to YouTube on or about February 5, 2023, Yeung orally touted QZ Asset's "consistently profitable and sustainable" business model and the promised "weekly returns."

50.     QZ Asset's Advisory Agreements similarly promised complete protection from the loss of principal. The Advisory Agreements provided, "[y]our asset [sic] under management will comprise of two components: i) your principal deposit; ii) 100% capital bonus," and then explained under a heading of "Capital Protection" that "[a]ll asset [sic] under management will be subject to a 50% stop loss limit under the Capital Protection Scheme. This shall serve as a safeguard [for] your principal deposit."

51.     QZ Asset and Yeung made all of these statements regarding clients being protected from loss. Each had ultimate authority over the statements.

52.     A reasonable person would have understood from these statements that there was little to no risk in investing with QZ Asset because QZ Asset and Yeung repeatedly told clients their investment was 100% protected.

53.     These statements were false and misleading because at least 285 clients lost at least $6 million, which means their funds were not 100% protected. QZ Asset's clients lost access to their funds when QZ Asset's website became inaccessible, resulting in client losses of millions of dollars.

54.     These statements concerning the risk of loss were false and misleading when made and Yeung knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he controlled QZ Asset and QZ Asset controlled its clients' advisory accounts and funds and, therefore, Yeung knew or was reckless in not knowing, and should have known, that clients' funds were not 100% protected.

55.     Yeung's scienter and negligence is imputed to QZ Asset because he was its CEO.

56.     The statements about the risk of loss were material to clients because clients or prospective clients who were considering opening and maintaining accounts with QZ Asset would consider the security of, and access to, their funds as important to their investment decision.

### B. Defendants Made False and Misleading Statements About the Anticipated QZ Global IPO.

57.     Defendants made false and misleading statements in registration statements, press releases, and materials provided to clients and prospective clients by claiming that their stock was to be listed on Nasdaq, and that they had conversations with the SEC, which had approved the IPO.

58.     In the Form S-1, filed in February 2023, a March 8, 2023 press release, and other materials provided to clients and/or prospective clients, Defendants made false and misleading statements about QZ Global's efforts to have its stock listed on Nasdaq and QZ Asset's claims the SEC had fast tracked "approval" of the IPO.

59.     Specifically, in the Form S-1, which Yeung signed, QZ Global stated: "We have applied to have our Class A common stock listed on the [Nasdaq] under the symbol 'QZAM'."

60.     Similarly, in the Nasdaq Presentation, QZ Asset repeatedly referred to the "NASDAQ IPO" as follows:

a.     The first slide, entitled "QZ NASDAQ IPO," explained that listing on Nasdaq would: boost the company's valuation, reputation, profile, and credibility; allow the company to gain access to the U.S. capital market; attract investment opportunities and world-class talents; and raise funding for further research and development of BDAI technology and for global expansion.

b.     The fourth slide provided a timeline for the "NASDAQ IPO" and the fifth provided a "PRE-IPO PLACEMENT ROADMAP" (shown below), both of which showed a planned IPO on NASDAQ by August 2023.



61.     In an undated presentation posted to YouTube on or about February 23, 2023, Yeung told clients and prospective clients that the purported IPO will result in "20X capital gains in under six months."

62.     In a March 8, 2023 press release, QZ Asset claimed to have "set terms for its [IPO].… The company is offering 60 million ordinary shares in the IPO, which is expected to price between $4 to $6 per share, on the Nasdaq exchange under the ticker symbol 'QZAM.'" Yeung is quoted in the press release as stating: "We have been working towards going public for a while now and we are very pleased with the progress so far. An IPO listing will give us the resources and impetus to take BDAI to the next level.…"

63.     In a March 23, 2023 "CEO weekly update" available on YouTube, Yeung stated: "So let's have some update on our QZ IPO. Positive discussions with SEC officials have taken place following our Bangkok trip, and we are on track to list in August. Approval is expected to come sometime in June …. "

64.     Further, on or around May 1, 2023, QZ Asset sent a memorandum titled "IPO Audit Final Stage (Approval in principle)" to clients, published on their online trading portals, stating that it had received updates from the SEC that QZ Asset's application had been "fast tracked for approval" and that a purported "financial audit will begin in May," which, "once completed, we should receive the approval-in-principle for the IPO to go ahead in June. Everything is going as planned and we are now one step away from getting the IPO approval!"

65.     This memorandum also announced that withdrawals from client accounts were temporarily suspended because clients needed to submit tax documentation for processing by "U.S. authorities" or be subject to a "30% withholding tax" on all purported income reflected in the clients' advisory accounts.

66.     Similarly, in a May 1, 2023 CEO weekly update video posted to YouTube, Yeung stated: "In these first four months of 2023, we have accomplished so much. In January, we filed for our IPO and launched [a private placement].…  We are now at the last phase of

financial auditing by SEC, which will take between six to eight weeks." Yeung went on to claim that there would be "some inconvenience and disruption to our operations" during that time.

67.     A reasonable person would have understood from these statements that QZ Global's purported IPO was moving forward, and that Defendants were in communication with the SEC, who had approved of the IPO moving forward.

68.     Defendants made all of these statements regarding the IPO and communications with the SEC, who had purportedly approved of the IPO moving forward, and each had ultimate authority over the statements.

69.     Defendants' statements about QZ Global's IPO and its interactions with the SEC were false and misleading because QZ Global never initiated a listing with Nasdaq; QZ Asset never responded to SEC staff's letters stating that its Form S-1 contained material deficiencies; and SEC staff never "fast tracked" any of QZ Asset's submissions, met with any QZ Asset officials, or undertook any audit of QZ Asset's financial statements.

70.     Defendants' statements about QZ Global's IPO and its interactions with the SEC were false and misleading when made and as the CEO of both QZ Global and QZ Asset, Yeung, knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he knew Defendants had not initiated a listing with Nasdaq and had not received any positive communications from SEC staff. To the contrary, Yeung had been told that QZ Global's Forms 1-A contained material deficiencies and needed to be re-submitted before SEC staff would conduct further review.

71.     Yeung's scienter and negligence is imputed to QZ Global and QZ Asset because he was their CEO.

72.      The statements about QZ Global's IPO and Defendants' purported interactions with the SEC were material to clients and prospective clients because both would consider it important to know whether or not they were purchasing pre-IPO shares in a company that was actually going to become a public company and that the Defendants had not initiated the process to list QZ Global's common stock on Nasdaq, had not received positive communications from SEC staff and, instead, had been told by SEC staff that QZ Global's SEC filings contained material deficiencies and needed to be re-submitted before SEC staff would conduct further review.

### C.  QZ Asset and Yeung made False and Misleading Statements Regarding Well-Known Service Providers.

73.      QZ Asset and Yeung made false and misleading statements in QZ Asset's Prospectus and presentations regarding well-known service providers, including making false statements regarding its auditor, legal counsel, and liquidity providers.

74.      In the Prospectus, QZ Asset claimed that a specific Big Four accounting firm was its auditor, a specific global law firm was its legal counsel, and two well-known financial providers were among its liquidity providers.

75.      In one Zoom webinar, previously posted to YouTube on or about March 19, 2023, a prospective client specifically asked about the availability of audit materials and Yeung confirmed in his response that the Big Four accounting firm was QZ Asset's auditor.

76.      A reasonable person would have understood from these statements that QZ Asset had relationships with well-known and reputable financial and legal firms.

77.      QZ Asset and Yeung made all of these statements about QZ Assets' relationship with well-known and reputable financial and legal firms. Each had ultimate authority over the statements. QZ Asset and Yeung's statements regarding QZ Asset's financial and legal service

providers were false and misleading because these well-known and reputable financial and legal firms did not have a relationship with QZ Asset or QZ Global.

78.     QZ Asset's and Yeung's statements regarding QZ Asset's financial and legal service providers were false and misleading when made and Yeung, as the CEO of QZ Asset, knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he knew or was reckless in not knowing, and should have known, that neither QZ Asset nor Yeung had a relationship with these service providers during the relevant period.

79.     Yeung's scienter and negligence is imputed to QZ Asset because he was its CEO.

80.     The statements about QZ Asset's relationships with service providers were material to clients and prospective clients because reasonable clients and prospective clients would consider it important that QZ Asset had relationships with well-known and reputable financial and legal firms.

**D.  QZ Asset Obtained Money or Property from Its Misstatements.**

81.     QZ Asset obtained money by means of the false and misleading statements detailed above because QZ Asset used the statements to solicit clients who then provided QZ Asset with funds for their advisory accounts.

**III.   Defendants Engaged in Fraudulent and Deceptive Conduct.**

82.     In addition to making and distributing the false and misleading statements detailed above, Defendants engaged in additional fraudulent and deceptive conduct by misleading clients about the reasons for not honoring their withdrawal requests and using QZ Global's SEC filings to lend legitimacy to their scheme.

83.     As detailed above, Defendants touted QZ Global's purported IPO to induce clients and prospective clients to invest with QZ Asset. To lend legitimacy to their claimed efforts, QZ Asset and Yeung pointed clients and prospective clients to QZ Global's SEC filings, which are publicly available.

84.     The Nasdaq Presentation included a slide titled "How to Search for QZ's IPO Filing," with screenshots of the EDGAR webpage along with instructions on how to find the Form S-1 (as shown below).



85.     Upon information and belief, Defendants never intended to complete an IPO or for its Forms 1-A or Form S-1 to become effective, but instead to use QZ Global's SEC filings to deceive their clients and prospective clients. Defendants' following actions demonstrate that the SEC filings were made to deceive clients and prospective clients: (a) QZ Global's submission of Forms 1-A (which are for exempt—not registered—securities offerings) failed to include basic, required information such as financial statements and Form 1-A's Parts II and III; (b) Defendants did not submit to the SEC any amendment to QZ Global's SEC filings to remedy their deficiencies; (c) Yeung and QZ Asset made false statements about their communications with

SEC staff; (d) Defendant did not acknowledge, much less disclose, SEC staff's letters noting the deficiencies in the SEC filings; and (e) Defendants disappeared with clients' funds.

86.     Yeung knew or was reckless in not knowing, and should have known, that Defendants were touting defective SEC filings to clients and prospective clients.

87.     Further, on or around May 1, 2023, QZ Asset sent a memorandum titled "IPO Audit Final Stage (Approval in principle)" to clients stating that the SEC had "fast tracked" QZ Asset's IPO application for "approval," and that a purported SEC "financial audit will begin in May." Both claims were false.

88.     This memorandum also announced the suspension of withdrawals from clients' advisory accounts pending submission of tax documentation for processing by "U.S. authorities."

89.     Similarly, in a May 1, 2023 CEO weekly update video posted to YouTube, Yeung claimed that QZ Asset was in the "phase of financial auditing by SEC, which will take between six to eight weeks," which would result in "some inconvenience and disruption to our operations" during that time.

90.     In approximately late May 2023, QZ Asset effectively disappeared. The QZ Asset website stopped operating and clients could no longer access their QZ Asset accounts and had no way to withdraw their money; it stopped communicating with clients via WhatsApp chat groups, where clients received the bulk of communications along with its website; and it stopped hosting the weekly Zoom webinars on which Yeung often appeared.

91.     Yeung knew or was reckless in not knowing, and should have known, that he and QZ Asset were deceiving its clients and prospective clients by ceasing communications with clients and depriving them of access to their funds.

92.     Yeung's scienter and negligence is imputed to QZ Global and QZ Asset because he was their CEO.

**IV. QZ Asset Violated the Advisers Act, Which Yeung Aided and Abetted.**

93.     QZ Asset provided investment advisory services to its clients, held itself out as an asset manager that engaged in securities trading, and solicited clients to open advisory accounts. In exchange for its advisory services, QZ Asset charged management fees.

94.     As an investment adviser, QZ Asset owed a fiduciary obligation to its clients. As such, QZ Asset owed its clients an affirmative duty of utmost good faith, had an affirmative obligation to employ reasonable care to avoid misleading its clients, had a duty to act in its clients' best interest, and was obligated to provide full and fair disclosure of all material facts to its clients.

95.     As alleged herein, QZ Asset breached its fiduciary duties by making the false and misleading statements and engaging in the deceptive conduct set forth above.

96.     As the CEO of QZ Asset, and based on his own personal conduct, as described above, Yeung knew or was reckless in not knowing, and should have known, of QZ Asset's violations of its fiduciary duties. Yeung's scienter and negligence is imputed to QZ Asset.

97.     As alleged herein, Yeung knowingly or recklessly provided substantial assistance to QZ Asset's breaches of its fiduciary duties.

**V.   Defendants' Conduct was in Connection with the Offer or Sale and Purchase or Sale of Securities and Done Using Interstate Commerce.**

98.     Defendants offered and sold investments that are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(1)(10)].

99.     Defendants' conduct involved two types of securities.

100.     First, QZ Asset is an investment adviser that defrauded clients in connection with providing advisory services to clients. QZ Asset claimed to be buying and selling securities on behalf of its clients through its BDAI trading program.

101.     Second, QZ Global's pre-IPO shares were securities as they were stocks in the future public company.

102.     Defendants made and disseminated false and misleading statements and engaged in deceptive conduct alleged above to induce clients to open advisory accounts which claimed to invest in securities and to purchase "Pre-IPO Shares" of QZ Global, which were also securities.

103.     The misstatements described above were made in written and oral communications soliciting clients and investments by those clients and were contained in Advisory Agreements, the Form S-1 filed with the SEC, and presentations provided to clients, as well as in online chat groups and webinars for clients and prospective clients, in connection with investments in securities.

104.     In connection with the conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including soliciting clients by providing documents containing false and misleading statements via email, chat groups, the QZ Asset website, and webinars.

## FIRST CLAIM FOR RELIEF
### Fraud—Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Against All Defendants)

105.     The SEC realleges and incorporates by reference paragraphs 1 to 104 as though fully set forth herein.

106.     By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or severely recklessly: employed devices, schemes, or artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

107.     By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
**Fraud—Violation of Section 17(a)(1) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)]**
**(Against All Defendants)**

108.     The SEC realleges and incorporates by reference paragraphs 1 to 107 as though fully set forth herein.

109.     By engaging in the conduct alleged above, Defendants, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails: employed devices, schemes, or artifices to defraud, and/or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

110.     Regarding violations of Section 17(a)(1), Defendants engaged in the conduct intentionally, knowingly, or with severe recklessness. Regarding violations of the Section 17(a)(3), Defendants acted at least negligently.

111.    By virtue of the foregoing, Defendants violated and, unless restrained and enjoined, will again violate Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), (a)(3)].

**THIRD CLAIM FOR RELIEF**
**Fraud—Violation of Section 17(a)(2) of the Securities Act**
**[15 U.S.C. § 77q(a)(2)]**
**(Against QZ Asset)**

112.    The SEC realleges and incorporates by reference paragraphs 1 to 111 as though fully set forth herein.

113.    By engaging in the conduct alleged above, QZ Asset, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and QZ Asset acted at least negligently.

114.    By virtue of the foregoing, QZ Asset violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Sections 206(1) and 206(2) of the Advisers Act**
**[15 U.S.C. §§ 80b-6(1) and 80b-6(2)]**
**(Against QZ Asset)**

115.    The SEC realleges and incorporates by reference paragraphs 1 to 114, as though fully set forth herein.

116.    QZ Asset, while acting as investment adviser, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, acting with the requisite state of mind: (a) employed devices, schemes or artifices to defraud clients or prospective clients; and

(b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

117.    By engaging in the conduct described above, QZ Asset violated, and unless restrained and enjoined, will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act**
**[15 U.S.C. § 77q(a)]**
**(Against Yeung)**

118.    The SEC realleges and incorporates by reference paragraphs 1 to 117, as though fully set forth herein.

119.    By engaging in the conduct alleged above, Yeung provided knowing and substantial assistance to QZ Asset, who, while acting as investment adviser, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, acting with the requisite state of mind: (a) employed devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

120.    Accordingly, Yeung aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that the Defendants committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint;

**IV.**

Order that the Defendants pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and, as to QZ Asset and Yeung, Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], in an amount to be determined by the Court, plus post-judgment interest;

**V.**

Order that Yeung be prohibited from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**VII.**

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: August 26, 2024.

Respectfully submitted,

*s/ Jodanna L. Haskins*
Jodanna L. Haskins
Attorney for Plaintiff UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, Suite 1700
Denver, Colorado 80294
HaskinsJo@sec.gov
(303) 844-1000

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES SECURITIES AND EXCHANGE

### DEFENDANTS

QZ GLOBAL LIMITED, QZ ASSET MANAGEMENT LIMITED, and BLAKE YEUNG PU LEI

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

Codington County

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability / [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability / [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability / [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury / [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations / [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - / [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other / [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education / [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, 15 U.S.C. § 77q(a), 15 U.S.C. § 80b-6(1), 15 U.S.C. § 80b-6(2)

Brief description of cause:
Securities Fraud

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
08/26/2024

SIGNATURE OF ATTORNEY OF RECORD
Jodanna L. Haskins

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.